**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| RICHARD KOCH, ANASTAZIA SCHULTZ, EDWARD BAILEY, BRITTANY HARDY, STEPHANIE THAYER, JOHN THAYER, JAYNA RAMIREZ, and DIANE STUTZKE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RRCA ACCOUNTS MANAGEMENT, INC.,<br><br>Defendant. | Case No. 3:24-cv-50480<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiffs Richard Koch, Anastazia Schultz, Edward Bailey, Brittany Hardy, Stephanie Thayer, John Thayer, Jayna Ramirez, and Diane Stutzke ("Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Class Action Complaint against Defendant RRCA Accounts Management, Inc. ("RRCA" or "Defendant"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiffs bring this class action against RRCA for its failure to secure and safeguard approximately 115,837 individuals' personally identifying information ("PII") and personal health information ("PHI"), including names, addresses, phone numbers, dates of birth, and email addresses with one or more of the following: Social Security number or taxpayer ID, driver's license number, passport number, health insurance information, health information (medical record number, places of treatment, doctors), payment information (billing and insurance claims,

payment card and account numbers), username, IP address, and/or demographic information (gender, religious views, race).

2. RRCA is a debt collection agency that operates along the Lincoln Highway between DeKalb, Illinois, and Clinton, Iowa.

3. On or about June 6, 2024, an unauthorized third party gained access to RRCA's network systems and obtained files containing the PII/PHI of RRCA's clients' customers (the "Data Breach").

4. RRCA owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. RRCA breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its clients' customers' PII/PHI from unauthorized access and disclosure.

5. As a result of RRCA's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred on or about June 6, 2024.

6. Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, unjust enrichment, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Richard Koch***

7. Plaintiff Richard Koch is a citizen of Illinois.

8. Plaintiff Koch was a customer of one of RRCA's clients.

9. At all relevant times, RRCA stored and maintained Plaintiff Koch's PII/PHI on its network systems.

10. Plaintiff Koch received a letter from RRCA notifying him that his PII/PHI was in the files accessed in the Data Breach.

11. As a direct result of the Data Breach, Plaintiff Koch has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; and deprivation of the value of his PII/PHI.

***Plaintiff Anastazia Schultz***

12. Plaintiff Anastazia Schultz is a citizen of Illinois.

13. Plaintiff Schultz was a customer of one of RRCA's clients.

14. At all relevant times, RRCA stored and maintained Plaintiff Schultz's PII/PHI on its network systems.

15. Plaintiff Schultz received a letter from RRCA notifying her that her PII/PHI was in the files accessed in the Data Breach.

16. As a direct result of the Data Breach, Plaintiff Schultz has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; and deprivation of the value of her PII/PHI.

***Plaintiff Edward Bailey***

17. Plaintiff Edward Bailey is a citizen of Illinois.

18. Plaintiff Bailey was a customer of one of RRCA's clients.

19. At all relevant times, RRCA stored and maintained Plaintiff Bailey's PII/PHI on its network systems.

20. Plaintiff Bailey received a letter from RRCA notifying him that his PII/PHI was in the files accessed in the Data Breach.

21. As a direct result of the Data Breach, Plaintiff Bailey has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; and deprivation of the value of his PII/PHI.

22. Plaintiff Bailey has received increased spam calls since the Data Breach occurred, increasing from approximately a few per week to approximately seven per day.

***Plaintiff Brittany Hardy***

23. Plaintiff Brittany Hardy is a citizen of Illinois.

24. Plaintiff Hardy was a customer of one of RRCA's clients.

25. At all relevant times, RRCA stored and maintained Plaintiff Hardy's PII/PHI on its network systems.

26. Plaintiff Hardy received a letter from RRCA notifying her that her PII/PHI was in the files accessed in the Data Breach.

27. As a direct result of the Data Breach, Plaintiff Hardy has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity

theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; and deprivation of the value of her PII/PHI.

28. Plaintiff Hardy has received increased spam calls since the Data Breach occurred, increasing from almost zero per week to approximately two to three per week.

***Plaintiff Stephanie Thayer***

29. Plaintiff Stephanie Thayer is a citizen of Illinois.

30. Plaintiff S. Thayer was a customer of one of RRCA's clients.

31. At all relevant times, RRCA stored and maintained Plaintiff S. Thayer's PII/PHI on its network systems.

32. Plaintiff S. Thayer received a letter from RRCA notifying her that her PII/PHI was in the files accessed in the Data Breach.

33. As a direct result of the Data Breach, Plaintiff S. Thayer has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; and deprivation of the value of her PII/PHI.

***Plaintiff John Thayer***

34. Plaintiff John Thayer is a citizen of Illinois.

35. Plaintiff J. Thayer was a customer of one of RRCA's clients.

36. At all relevant times, RRCA stored and maintained Plaintiff J. Thayer's PII/PHI on its network systems.

37. Plaintiff J. Thayer received a letter from RRCA notifying him that his PII/PHI was in the files accessed in the Data Breach.

38. As a direct result of the Data Breach, Plaintiff J. Thayer has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; and deprivation of the value of his PII/PHI.

***Plaintiff Jayna Ramirez***

39. Plaintiff Jayna Ramirez is a citizen of Illinois.

40. Plaintiff Ramirez was a customer of one of RRCA's clients.

41. At all relevant times, RRCA stored and maintained Plaintiff Ramirez's PII/PHI on its network systems.

42. Plaintiff Ramirez received a letter from RRCA notifying her that her PII/PHI was in the files accessed in the Data Breach.

43. As a direct result of the Data Breach, Plaintiff Ramirez has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; and deprivation of the value of her PII/PHI.

44. Plaintiff Ramirez has experienced an increase in spam emails since the Data Breach, now receiving approximately 100 spam emails per week.

***Plaintiff Diane Stutzke***

45. Plaintiff Diane Stutzke is a citizen of Illinois.

46. Plaintiff Stutzke was a customer of one of RRCA's clients.

47. At all relevant times, RRCA stored and maintained Plaintiff Stutzke's PII/PHI on its network systems.

48. Plaintiff Stutzke received a letter from RRCA notifying her that her PII/PHI was in the files accessed in the Data Breach.

49. As a direct result of the Data Breach, Plaintiff Stutzke has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; and deprivation of the value of her PII/PHI.

***Defendant RRCA Accounts Management, Inc.***

50. Defendant RRCA Accounts Management, Inc. is an Illinois corporation with its principal place of business located at 201 E.3rd St., Sterling, IL 61081. It may be served through its registered agent: Kevin Heller, 201 E.3rd St., Sterling, IL 61081.

## JURISDICTION AND VENUE

51. The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

52. This Court has general personal jurisdiction over RRCA because it maintains its principal place of business in this District.

53. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because RRCA's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of RRCA and the Data Breach*

54. RRCA is a debt collection agency providing services to its clients in Northwest Illinois since 1979.[1] RRCA claims that "[a]lthough medical care facilities and providers are [its] primary market, RRCA services utility and retail clients, all sizes of businesses, property owners, and municipalities."[2]

55. In the regular course of its business, RRCA collects and maintains the PII/PHI of its clients' customers, including Plaintiffs and Class member.

56. On or about June 6, 2024, an unauthorized third party "attacked a limited part of [RRCA's] systems without permission."[3] RRCA later learned that "there was a full release of [its] clients' customers' personal information on August 20, 2024."[4]

57. The Play Ransomware group claimed responsibility for the Data Breach.[5] The Play Ransomware group is a known threat actor that has been recognized by the U.S. Cybersecurity & Infrastructure Security Agency.[6] The FBI is aware of "approximately 300 affected entities

---

[1] *About*, RRCA ACCOUNTS MANAGEMENT, https://rrcaaccounts.com/index.html (last accessed Nov. 26, 2024).
[2] *Id*.
[3] *RRCA Accounts Management, Inc. Reports Ransomware Attack and Data Breach*, FOX59 (Oct. 18, 2024, 8:30 PM), https://fox59.com/business/press-releases/cision/20241018SF34143/rrca-accounts-management-inc-reports-ransomware-attack-and-data-breach/ (last accessed Nov. 26, 2024) (the "Data Breach Notice").
[4] *Id*.
[5] *Play Ransomware Group Targets RRCA Accounts Management*, HALCYON, https://www.halcyon.ai/attacks/play-ransomware-group-targets-rrca-accounts-management (last accessed Nov. 26, 2024).
[6] *#StopRansomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (Dec. 18, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-352a.

allegedly exploited" by Play.[7] The group "employ[s] a double-extortion model, encrypting systems after exfiltrating data."[8]

58. While RRCA learned of the Data Breach on or about June 7, 2024, it waited until approximately October 18, 2024, over four months later, to begin notifying its clients' customers that the Data Breach occurred and that their PII/PHI was in the hands of cybercriminals.[9]

59. RRCA's failure to promptly notify Plaintiffs and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***RRCA Knew that Criminals Target PII/PHI***

60. At all relevant times, RRCA knew, or should have known, that the PII/PHI that it collected and stored was a target for malicious actors. Despite such knowledge, RRCA failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyberattacks that it should have anticipated and guarded against.

61. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata

---

[7] *Id*.
[8] *Id*.
[9] *See* Data Breach Notice, *supra* note 3.

breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

62. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2024 report, the healthcare compliance company Protenus found that there were 1,161 medical data breaches in 2023 with over 171 million patient records exposed.[11] This is an increase from the 1,138 medical data breaches which exposed approximately 59 million records that Protenus compiled in 2023.[12]

63. PII/PHI is a valuable property right.[13] The value of PII/PHI as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies are estimated to have spent over $19 billion on acquiring

---

[10] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[11] *See 2024 Breach Barometer*, PROTENUS 2, https://protenus.com/hubfs/Breach_Barometer/Latest%20Version/Protenus%20-%20Industry%20Report%20-%20Privacy%20-%20Breach%20Barometer%20-%202024.pdf (last accessed Nov. 26, 2024).

[12] *See id*.

[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[14] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[15] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

personal data of consumers in 2018.[16] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

64. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

65. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[17] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[18]

66. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[19] According to a report released by the Federal Bureau of

---

[16] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[17] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[18] *Id.*

[19] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[20]

67. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[21] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[22]

68. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

69. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[20] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[21] Steager, *supra* note 17.

[22] *Id.*

[23] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

70. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[24] [25]

71. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[26]

72. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[27]

73. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[24] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 26, 2024).

[25] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[26] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[27] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 26, 2024).

that can plague victims' medical and financial lives for years."[28] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[29] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [30] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[31]

74. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[28] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[29] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 20.

[30] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Sept. 10, 2024).

[31] *Id*.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [32]

75. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[33]

76. It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiffs and Class Members***

77. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the

[32] *See* Dixon & Emerson, *supra* note 28.
[33] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

## **CLASS ALLEGATIONS**

78. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

79. Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

80. Excluded from the Class are RRCA Accounts Management, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

81. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

82. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. RRCA has reported to the U.S. Department of Health and Human Services that the Data Breach affected approximately 115,837 persons.[34]

83. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

---

[34] *Cases Currently Under Investigation*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Nov. 26, 2024).

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII/PHI of Plaintiffs and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

d. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiffs and Class members;

e. Whether Defendant breached its duties to protect Plaintiffs' and Class members' PII/PHI; and

f. Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

84. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

85. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

86. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

87. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## **CAUSES OF ACTION**

### **COUNT I**
### **NEGLIGENCE**

88. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

89. RRCA owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

90. RRCA knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI and the importance of maintaining secure systems. RRCA knew or should have known of the many data breaches that targeted companies that collect and store PII/PHI in recent years.

91. Given the nature of RRCA's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, RRCA should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

92. RRCA's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

93. RRCA's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as RRCA, of failing to employ reasonable measures to protect and secure PII/PHI.

94. RRCA's duties also arise from the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS. 530/45.

95. Additionally, under 815 ILCS 530/10, RRCA had a duty to "notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach . . . in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10,

96. RRCA violated HIPAA Privacy and Security Rules, Section 5 of the FTCA, and IPIPA by failing to use reasonable measures to protect Plaintiffs' and Class members'

PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. RRCA's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and Class members.

97. RRCA's violation of IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA constitutes negligence per se.

98. Plaintiffs and Class members are within the class of persons that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to protect.

99. The harm occurring as a result of the Data Breach is the type of harm that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

100. RRCA breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiffs' and Class members' PII/PHI.

101. It was reasonably foreseeable to RRCA that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security

processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

102. But for RRCA's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

103. As a result of RRCA's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in RRCA's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## COUNT II
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, *et seq*. ("ICFA")

104. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

105. RRCA offered and continues to offer debt collection services in the State of Illinois.

106. Plaintiffs and Class members received services from RRCA's clients for personal, family, or household purposes.

107. RRCA engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security measures to protect and secure its clients' customers' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards.

108. RRCA's duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. RRCA violated this duty by failing to implement reasonably secure data security policies.

109. RRCA further violated the ICFA by failing to notify its clients' customers of the Data Breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

110. Due to the Data Breach, Plaintiffs and Class members have lost property in the form of their PII/PHI. Further, RRCA's failure to adopt reasonable practices in protecting and safeguarding its clients' customers' PII/PHI will force Plaintiffs and Class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for RRCA's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

111. As a result of RRCA's violations of the ICFA, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in RRCA's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 26, 2024

Respectfully submitted,

/s/ Ben Barnow
Ben Barnow (IL Bar No. 0118265)
Anthony L. Parkhill (IL Bar No. 6317680)
Riley W. Prince (IL Bar No. 6339536)
Nicholas W. Blue (IL Bar No. 6343317)
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com
nblue@barnowlaw.com

*Attorneys for Plaintiffs*